**Edward M. GOEMANS, Petitioner,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

**Nos. 12843, 12844.**

United States Court of Appeals
Seventh Circuit.

June 3, 1960.

John S. Best, Roy C. La Budde, Milwaukee, Wis., William J. Froelich, Chi-

cago, Ill., Frank J. Pelisek, Milwaukee, Wis. (Jacob I. Grossman, Chicago, Ill., of counsel), for petitioner.

Charles K. Rice, Asst. Atty. Gen., Helen A. Buckley, Atty., Tax Division, U. S. Dept. of Justice, Lee A. Jackson, Robert N. Anderson, Attys., Dept. of Justice, Washington, D. C., for respondent.

Before HASTINGS, Chief Judge, CASTLE, Circuit Judge, and MERCER, District Judge.

MERCER, District Judge.

Taxpayer, Edward M. Goemans, prosecutes two petitions to review decisions of the Tax Court determining certain deficiencies in taxpayer's federal income tax for the taxable years 1945 through 1947, on the ground that the income of four separate trusts, created by taxpayer in November, 1944, was taxable to him as individual income in each of the years in question.

This case, like most of the so-called Clifford-trust cases, presents an issue which is difficult of decision and perplexing, simply because such cases, by their nature, do not admit of the development of absolute standards of decision. No clearly defined standard may be drawn on one side of which taxability, and on the other non-taxability, results. The basic issue here, and in each of the Clifford-trust cases, is whether taxpayer, as settlor of the trusts, exercised such incidents of ownership of the trust property as to render him taxable on the income therefrom under the broad general definition of gross income which is set forth in Section 22(a) of the Internal Revenue Code of 1939, 26 U.S.C.A. § 22(a). A review of the reported opinions in the Clifford-trust cases reveals only that the courts, in their resolution of that issue, have searched for a standard of decision which would make meaningful in this type of case the principle of *stare decisis*. In each instance, the court's searchings have ultimately led to the simple truth that decision of the final Clifford-trust case must probably travel

the same road which decision of the first traveled, namely, that the question of taxability hangs upon the unique facts and circumstances of the particular case.

Taxpayer devotes a large part of his brief and argument to lengthy analyses of prior decisions of this and other courts, pointing out that taxability, where found and sustained, is influenced by specific elements of control which are lacking here, and pointing out that the decision has been one of non-taxability in several cases upon fact situations somewhat similar to that of the case at bar. We do not find those analyses particularly helpful. Elements present in the case at bar were lacking in each of the cited cases and elements found in each of such cases are lacking here. To the extent of that distinction between the case at bar and the cases upon which taxpayer's reliance is placed, the Tax Court was traversing uncharted seas in its decision of this case. To the same extent our decision on review is uncharted by precedent and our decision must rest ultimately upon the evaluation of the unique facts and circumstances touching the formation and management of the trusts created by taxpayer.

There is no material dispute in the evidentiary facts. On November 24, 1944, taxpayer executed four trust agreements, each of which established a separate trust for the prime use and benefit of one of taxpayer's four minor children. The four trust instruments were identical except for the names of the beneficiaries and of the trustees named therein. Each of the trusts was irrevocable. Taxpayer reserved no contingent interest therein. Income was to be accumulated during the minority of the principal beneficiary in each instance and, with the corpus, was to be distributed to the beneficiary by installments, to be paid periodically from his majority to his age of 35 years.

An individual trustee was appointed for each of the trusts who were respectively, taxpayer's wife, and two sisters and a brother-in-law of taxpayer. Tax-payer expressly reserved control over each of the trusts only to the extent that he had authority to name successor trustees in the event of a vacancy, and to contribute additional assets to either of the trusts if he saw fit to do so.

Each trustee was authorized by his respective trust agreement to enter into a partnership, or partnerships, for the purpose of investing the funds of the trust and was authorized and empowered to employ others to manage such business ventures.

On the same day the trust agreements were executed, the four trustees, in their fiduciary capacities, entered into a partnership agreement organizing Mansgo Company, which was organized for the purpose of investing funds of the respective trusts. Each trust, as a partner in Mansgo, had a 25% interest in that company. On the same day, the four trustees appointed taxpayer as their attorney in fact to conduct the business of Mansgo. At the same time, taxpayer delegated his authority to Leo Roemer who was his brother-in-law and a business associate.

Shortly after the trusts were set up, the taxpayer deposited $8000.00 in a bank account opened in the name of Mansgo, which purported to represent at once, a contribution by taxpayer of $2000.00 for each of the trusts, and a capital investment by each trust in Mansgo. No bank account was ever opened and established for either of the trusts as such, the only account employed on behalf of the trusts being the Mansgo account. The only persons authorized to withdraw funds from that account were the taxpayer and Roemer, and from and after September, 1946, the taxpayer's wife.

On September 30, 1946, one K. W. Feld, the chief accounting officer of several companies with which taxpayer was associated, succeeded the two sisters and the brother-in-law as trustees of three of the trusts. He acted as trustee for the three trusts until September 27, 1949, at which time taxpayer's wife was appointed successor trustee of each, thus

becoming trustee of each of the four trusts.

The investment of the Mansgo funds was handled through a rather intricate financial arrangement. By way of background, in and prior to the year 1944, taxpayer was president, general manager, and a principal stockholder of Transit Bus Sales, a Wisconsin corporation, which is hereinafter referred to as Transit. That corporation was a franchised dealer in transit buses manufactured by the Ford Motor Company. The capital stock of the corporation was owned by taxpayer, one John P. Wagner, and Wagner's wife, who, for convenience, is hereinafter referred to as Mazie.

Transit began its operation under a franchise granted by the Ford Motor Company. In 1941, Ford organized Transit Buses, Inc., as the national distributor of its buses. On April 29, 1941, Transit received a new franchise from Transit Buses, Inc., which required Transit to handle parts and accessories for Ford buses and, also, to be equipped to render adequate service thereon to users thereof. Transit then installed a parts department which it operated until December, 1942. In December, 1942, at taxpayer's suggestion, a partnership, composed of taxpayer's wife and Mazie, was formed under the name of Transit Bus Parts, hereinafter, for convenience, referred to as Parts. On the date of the organization of Parts, the partners executed a power of attorney appointing taxpayer as their attorney in fact to conduct the business of the partnership. At the same time a sales agreement was entered into between Transit and Parts under which the latter purchased the parts department of Transit for its reasonable inventory value. Neither of the partners of Parts performed any active service for the partnership. After the sales agreement was executed, Transit purchased most of its parts and accessories from Transit Buses, Inc., and then resold them to Parts at cost without profit. Taxpayer managed the operation of Parts upon a commission basis.

The Tax Court held that Parts was a valid partnership for income tax purposes, and its history is important here only because of its relationship with one of the partnerships in which Mansgo's funds were invested.

On December 6, 1944, a partnership was formed under the name of Transit Bus Sales Company, hereinafter, for convenience, referred to as Sales No. 1. The partners of Sales No. 1 were Wagner, Mazie, Mansgo and Agnes Roemer, wife of Leo Roemer and taxpayer's sister, and their respective interests therein were Wagner, 20%; Mazie, 15%; Mansgo, 60%; and Agnes Roemer, 5%. Each partner was required to furnish his proportionate amount of capital, and profits and losses were to be shared and borne proportionately. On the same day, a power of attorney was executed by all of the partners of Sales No. 1, appointing Leo Roemer attorney in fact for the operation of the partnership business.

Sales No. 1 was organized for the purpose of buying, selling, leasing, and in all ways dealing with transportation equipment of any or all kinds, but from the minutes of a meeting of the directors of Transit, held December 4, 1944, it appears that the partnership was organized, at taxpayer's instance, for the specific purpose of operating a Ford bus dealership under the Transit franchise. That meeting was culminated with a resolution authorizing Transit to grant a franchise to a partnership to be organized by Roemer or to such other person or persons whom taxpayer might approve. Taxpayer was present when Sales No. 1 was organized and the franchise agreement with Transit was executed under which Sales No. 1 became the franchised dealer for the Ford buses in all of Transit's franchise area, except the City of Chicago. The franchise agreement between the parties was contingent upon the continuance of Transit's agreement with Transit Buses, Inc. Thereafter, at all pertinent times, Transit assumed the role of, and operated as, a distributor for the buses.

Roemer acted as general manager of Sales No. 1 until November 1, 1945, when he left the business and one John L. Doyne was employed as general manager. On November 27, 1945, Roemer, as attorney in fact, for the partnership, delegated his authority to taxpayer and Doyne, and, thereafter, terminated all activities on behalf of the partnership. Except for a brief period when he worked with Doyne, taxpayer took no active part in the actual management of the business.

In March, 1946, taxpayer was informed by Transit Buses, Inc., that an anticipated new bus in the Ford line would not be produced. Taxpayer thereupon decided to consolidate the bus business in Transit's franchise area. Consolidation was accomplished by the dissolution of Sales No. 1 and Parts on March 19, 1946, and the organization of Transit Bus Sales Company, as a partnership, which is hereinafter referred to as Sales No. 2. The interests of the respective partners in Sales No. 2 were Mansgo, 75%; Wagner, 12½%; and Mazie, 12½%. Adjustments were made in the capital structure to liquidate Agnes Roemer's capital account with Sales No. 1, and to adjust the accounts of the Sales No. 2 partners in accordance with Mansgo's increased interest.

On the same day that Sales No. 2 was organized, a power of attorney was executed by taxpayer, as attorney in fact for Mansgo, and by the partners appointing Doyne as their attorney in fact to conduct the business of the company. Sales No. 2 never entered into a formal franchise agreement with Transit. It did assume operations as a bus dealer and servicer in the territory previously occupied by Sales No. 1 and Parts, apparently operating informally under the franchises granted to its two predecessor companies.

In 1946, Ford notified Transit Buses, Inc., of the cancellation of its franchise to deal in Ford buses, effective October 1, 1947. On August 1, 1947, the latter company gave notice to Transit that its distributorship franchise for Ford buses would be cancelled effective October 1, 1947. On August 18, 1947, a new franchise agreement was executed by Transit Buses, Inc., and Transit, whereby Transit was given the exclusive right to sell a new line of buses being marketed by Transit Buses in the same territory in which it had previously distributed and sold the Ford line.

At a special meeting of the board of Transit, on March 11, 1948, it was decided that future business did not justify having bus dealerships and that the retail sales should again be handled by Transit with taxpayer engaging in active retail work. Pursuant to that resolution, the franchise contract with Sales No. 2 was cancelled and Transit purchased the assets of that partnership at book value as of May 1, 1948. Sales No. 2 was dissolved, effective April 30, 1948. The final balance in each partner's account was transferred to Transit and carried by that corporation as accounts payable, which were liquidated in full in 1950.

Each of the several partnerships had its own set of books, its own bank account and its own stationery, and each paid social security and withheld and reported taxes upon its employees. It appears that employees, to some degree, served Transit and the partnerships as well without strictly drawn lines as to who paid their salaries. Each partnership maintained offices in the same premises with the office of Transit.

Upon the evidence and its findings of fact, substantially as above summarized, the Tax Court concluded that Sales No. 1 and Sales No. 2 were valid partnerships for income tax purposes and that their income should be taxed accordingly, except that the income distributable to Mansgo, and through Mansgo to the trusts, was taxable as income to the taxpayer. That court further concluded that each of the trusts was a valid entity under state law but not for income tax purposes. Deficiency decisions entered against taxpayer in accordance with those conclusions are the subject of these petitions for review.

Our only function on review is to determine upon the record whether the findings of fact of the Tax Court are clearly erroneous. Boehm v. Commissioner, 326 U.S. 287, 293, 66 S.Ct. 120, 90 L.Ed. 78; Lusk v. Commissioner, 7 Cir., 250 F.2d 591.

Upon review of the whole record we cannot say, as a matter of law, that the Tax Court's findings which form the predicative basis for its decision are clearly erroneous. We think the Court of Appeals for the Eighth Circuit correctly stated the rationale of the Clifford-trust decisions, and the principle which is applicable here, in the following language from Edison v. Commissioner, 148 F.2d 810, 814, certiorari denied 326 U.S. 721, 66 S.Ct. 25, 90 L.Ed. 427: " * * * petitioner as a matter of economic and taxable reality has parted in effect with the formality of legal title only and has retained, within the purview of section 22(a), in the circumstances of the particular situation, the substantial equivalent, in control, satisfactions and economic significance, of his previous ownership. * * * an owner who makes a gift in trust of property may still be taxable on its income, notwithstanding the legal effectiveness of the gift, where he has retained such control of the incidents and elements of his previous ownership, viewed in their practical significance in relation to the specific dedication, as to leave him in economic substance and result with what he previously had and enjoyed in the family situation."

The Tax Court could reasonably find that the complex of the four trusts, Mansgo and the Sales Companies, Nos. 1 and 2, was part and parcel of a single scheme to channel income from one purpose of taxpayer to another. And the evidence supports the finding that taxpayer did, in fact, exercise full control of the whole complex, notwithstanding the lack of any reservation of the legal right so to do. Taxpayer selected trustees who were, in each instance, close relatives or business associates. As attorney in fact for Mansgo, taxpayer controlled the disposition, disbursement and investment of all money which constituted the corpus and income of the trusts. The record reveals that none of the trustees ever took any part in the management of the trusts or served any function in connection therewith other than signing tax returns. See, Byerly v. Commissioner, 6 Cir., 154 F.2d 879, certiorari denied 329 U.S. 727, 67 S.Ct. 79, 91 L.Ed. 629; McCutchin v. Commissioner, 5 Cir., 159 F.2d 472.

We think it immaterial that taxpayer delegated his authority as attorney in fact for Mansgo to Roemer, who was the active manager of Sales No. 1. That delegation was only so extensive as taxpayer's pleasure and could have been revoked by him whenever he saw fit so to do. And we accord little weight to taxpayer's argument that the trustees could have dissolved Mansgo at any time. The fact remains that Mansgo was not dissolved, and, in view of record proof that the trustees never exercised any independent judgment in relation to the management of these trusts, the Tax Court may well have inferred that Mansgo was continued and would be continued as long as taxpayer desired.

Taxpayer's position as president, general manager and a principal stockholder of Transit afforded, and was employed as, a second means of control of the trusts. It is significant that the source of income of the trusts was born of taxpayer's suggestion and continued until the whole scheme of taxpayer's economic endeavors led him to the conclusion that Sales No. 2 should be dissolved. Although taxpayer was not a partner in either Parts, Sales No. 1 and Sales No. 2, it is a reasonable inference upon the record that each of those partnerships blossomed by the instigation of taxpayer and, as readily, withered and died by his decree. Sales No. 1 was organized in 1944 as a part of the promotion of the effective management of Transit's business. When circumstances changed in 1946, it was taxpayer, not any of the partners, who made the decision that Sales No. 1 and Parts should be dissolved and their respective functions and operations be consolidated in a new company. Thus, Sales No. 2

was born and flourished until changed circumstances of Transit dictated in 1948 that its operation be taken over by Transit.

The Tax Court could properly find and infer that taxpayer used the purported trust property throughout the years in question to play therewith the economic game to the same extent as if he still retained legal title thereto. The Tax Court could further infer that income would, and could, be realized by the trusts only to the extent that taxpayer saw fit to channel income thereto, instead of channeling the same into ventures in which he retained legal ownership. The value of that power in this instance is borne out somewhat by the fact that the aggregate deficiency determined by the Tax Court for the years in question was the sum of $200,864.12, essentially all of which grew out of, and was attributable to, the initial $8,000.00 investment in Mansgo.

■ Taxpayer insists that he, as attorney in fact for the partnership of the four trusts, had a duty under Wisconsin law to act as a fiduciary for his principal, and that the decision holding the income of the trusts to be his individual income is clearly erroneous absent proof that taxpayer violated that fiduciary duty. There are two fallacies in that argument. First, the Tax Court did not find that taxpayer had violated any fiduciary relationship. Secondly, the fact of violation of such duty is not a prerequisite to the decision which the Tax Court reached. Cf. Williamson v. Commissioner, 7 Cir., 132 F.2d 489, 492. Taxpayer's argument overlooks the distinction drawn in Funsten v. Commissioner, 8 Cir., 148 F.2d at page 805, 809, that the settlor of a family trust may still be taxable upon its income if he has either "retained control of the substantial incidents and elements of his previous ownership, viewed in their practical significance in relation to the specific dedication," and the control exercised indicates the intent to make the trust property itself subject to the business skill of the settlor, or, if he has divorced himself from general control

of the property, he has retained the power to dispose of the income thereof. The Court continued its discourse upon the Clifford Trust principle in the following language: " * * * although the donor or settlor may not be entitled personally to receive back any part of the property or of the income, his power to control the property or dispose of the income may factually be so equivalent in the particular situation to economic ownership and enjoyment, as legally to constitute realization of economic benefit for revenue purposes and hence to give rise to taxability under section 22(a)."

One further contention of the taxpayer, namely, that the decisions cannot stand because no power to control was reserved by taxpayer in the trust instruments, must be discussed briefly. In that connection, taxpayer relies heavily upon the Tax Court's finding that the only power reserved to taxpayer by the trust instruments themselves was the right to add additional funds to the corpus of each trust and to name successor trustees. That argument begs the issue. The Clifford doctrine is predicated upon the premise that legal niceties of title are not controlling;—that a trust, though valid under state law, may still be not recognized for income tax purposes under Section 22(a) if the settlor retains control thereof to such extent that he still retains the indicia of ownership. E. g., Helvering v. Clifford, 309 U.S. 331, 60 S.Ct. 554, 84 L.Ed. 788; Helvering v. Stuart, 317 U.S. 154, 63 S.Ct. 140, 87 L.Ed. 154; Williamson v. Commissioner, 7 Cir., 132 F.2d 489. We think there is no valid distinction between power to control reserved in the trust instrument itself and de facto control exercised without any express reservation of power. Upon this record, we are convinced that the Tax Court could find and conclude that taxpayer exercised the normal incidents of ownership to such a degree as to bring these trusts within the purview of the Clifford doctrine.

In our opinion this case falls precisely within the provisions of the Clifford Reg-

ulations, the relevant parts of which follow:

"Treasury Regulations 111, promulgated under the Internal Revenue Code of 1939:

"Sec. 29.22(a)–21 [As added by T. D. 5488, 1946–1 Cum.Bull. 19]. Trust Income Taxable to the Grantor as Substantial Owner Thereof.— * * *

* * * * * *

"(e) Administrative control.—Income of a trust, whatever its duration, is taxable to the grantor *where*, under the terms of the trust or the circumstances attendant on its operation, *administrative control is exercisable primarily for the benefit of the grantor rather than the beneficiaries of the trust. Administrative control is exercisable primarily for the benefit of the grantor where—*

* * * * * *

"(4) any one of the following powers of administration over the trust corpus or income is exercisable by any person in a nonfiduciary capacity: a power to vote or direct the voting of stock or other securities, *a power to control the investment of the trust funds either by directing investments or reinvestments or by vetoing proposed investments or reinvestments*, and a power to reacquire the trust corpus by substituting other property, whether or not of an equivalent value.

"If a power is exercisable by a person as trustee, it is presumed that the power is exercisable in a fiduciary capacity primarily in the interests of the beneficiaries. Such presumption may be rebutted only by clear and convincing proof that the power is not exercisable primarily in the interests of the beneficiaries. *If a power is not exercisable by a person as trustee, it is presumed that the power is exercisable in a nonfiduciary capacity. But such presumption may be rebutted if it appears, from all the terms of the trust and the circumstances surrounding its creation and administration, that the power is exercisable primarily in the interests of the beneficiaries."* (Emphasis added.)

We hold that the taxpayer failed to discharge his burden of rebutting the presumption set out, supra, and therefore comes within the provisions of (e)(4) of the Regulations.

The decisions of the Tax Court are therefore affirmed.