**Foster L. TALGE, Plaintiff,**

v.

**The UNITED STATES of America, Defendant.**

**Civ. A. No. 13540–4.**

United States District Court
W. D. Missouri, W. D.

April 20, 1964.

Hillix, Hall, Hasburgh, Brown & Hoff-haus, by Albert F. Hillix, and Richard H. Brown, Alfred Kuraner, Kansas City, Mo., for plaintiff.

F. Russell Millin, U. S. Atty., by William A. Kitchen, Asst. U. S. Atty., Kansas City, Mo., William A. Miner, Tax Division, Dept. of Justice, Washington, D. C., for defendant.

BECKER, District Judge.

This is a suit for refund of gift taxes, interest and penalties brought pursuant to Section 1346(a) (1) of Title 28, United States Code. Plaintiff seeks recovery of gift taxes paid for the year 1947 in the amount of $6,399.59, of interest paid thereon in the amount of $5,007.68 and of a penalty paid thereon in the amount of $1,599.90.

The plaintiff has complied with all conditions precedent to filing the suit. Jurisdiction to hear and determine the suit exists.

The facts have been fully developed by pre-trial and post-trial stipulations and by evidence received at trial. The unusual factual pattern of this case has made very difficult the application of the controlling statutes, regulations and legal principles.

### Background Facts

In December, 1945, plaintiff, Foster L. Talge, and his father, Henry Talge, were joint owners of a number of mechanical and design patents and patent applications useful in the manufacture and sale of housewares (sometimes called kitchenwares) including, among other things, can openers, juice extractors, ice crushers, grinders and salad making machines.

At that time plaintiff and his father were also partners in a partnership enterprise known as Rival Manufacturing Company. (This company was incorporated on January 22, 1946. It is referred to hereinafter as "Rival.") Rival had been manufacturing and selling housewares under the jointly owned patents since 1936 (except for 1943 and 1944 war work years).

These patents and patent applications were, and are, classified as wasting assets. Each had a life of seventeen years. On February 1, 1946, these patents had an average remaining life of about nine and three quarters years. Evaluated under Hoskold's formula plaintiff's one-half of the patents and patent applications

were worth $31,160.13 on February 1, 1946.[1]

In February, 1946, Rival had all the facilities, including tools, dies and production machinery, to manufacture the housewares covered by the patents and patent applications, and had been manufacturing some of them for a substantial period of time. Rival then owned attractive established brand names under which it had successfully sold its general line of housewares in the past, including some of the housewares covered by the patents.

### Features of the Housewares Industry

The housewares industry is, and was at all times in question, a very competitive industry in which the products are sold at relatively low prices. In many lines a competitor can make modifications in patented items manufactured by others and produce substantially the same products without liability for infringement. Each competing manufacturer in the housewares field seeks to establish a market for its unique line under its own brand names. This makes it difficult for an established manufacturer profitably to shift to a new line, requiring new tools and dies, a break in continuity of production and sales and customer acceptance of new items under the established brand names or establishment of new brand names for the new items.

Another feature of the housewares industry is the necessity of continued research and development of improvements on existing patents in order to remain competitive, because of rapid obsolescence of many items.

In the housewares industry manufacture and sale of a general line results in a saving on sales costs.

As in most competitive industries, achievement and maintenance of a high volume of gross sales is definitely desirable from the standpoint of the licensor of patents, who is paid royalties on a percentage of sales. A history of high volume of gross sales increases the

---

1. Present royalty rate ($11,574) x average years remaining life (9¾) evaluated under Hoskold's formula.

amount of royalties to be expected from any given percentage of sales.

In 1945 Rival had reached a peak volume of gross sales of $1,123,057 from items manufactured under patents owned by plaintiff and his father. The experience from 1936 to 1945 inclusive afforded a reasonable basis for determining on February 1, 1946, the value of the patents and patent applications.[2]

### Plaintiff's Purposes

In December of 1945 the plaintiff became interested in creating a "living estate" for his three minor children, Jacquelynne, age 10, Henry Stephen, age 8, and Foster, Jr., age 7. He proposed to create this interest for his children by gifts of his interest in the patents and patent applications owned by his father and himself.

The plaintiff's purposes for desiring to make the gifts were (1) to remove the property to be donated from the risk of loss from speculation and errors of judgment; (2) to remove the property from the risk of his business; (3) to obtain the benefit of expert management of money; and (4) to relieve himself from the burden of income taxes arising from the property to be given. (In respect to this latter purpose, (4), whether he was successful is beyond the issues in this case as will be pointed out hereinafter.)

### Advice of Counsel

In December of 1945 the plaintiff Talge consulted the law firm of Gage, Hillix, Shrader and Phelps, then a well known and reputable firm in Kansas City, Missouri, engaged in the general practice, including federal tax practice. He was initially referred to John E. Park, Esquire, then a member of the firm. Thereafter plaintiff received advice and services from Mr. Park and Mr. Hillix of the firm, and also services from Thomas E. Scofield, Esquire, of Kansas City, an attorney specializing in patent law since 1924.

At the outset Mr. Park advised the plaintiff that in order to accomplish his purposes, plaintiff would have to divest himself completely and irrevocably of ownership of his interest in patents. The plaintiff then instructed Mr. Park to prepare the necessary documents.

### The General Plan of the Gifts

After studying the problems involved in the gifts, counsel and the plaintiff devised the following plan.

*First*, the plaintiff and his father would execute a joint trust agreement whereby they would convey to John C. Hockery, as trustee, the patent and patent applications; retaining rights and powers (a) to receive the income from the trust, (b) to receive the remaining income and corpus on termination of the trust, (c) to designate a successor trustee, other than one of the settlors, in case of death, resignation or disability of the trustee, and (d) to dispose of beneficial interests therein by sale, assignment or transfer. This trust would be irrevocable and not subject to amendment. (It is hereinafter referred to as the "Hockery Trust.")

*Second*, the settlors intended, and so advised the proposed trustee Hockery, that Rival was to be the licensee of the patents at a fair and reasonable royalty. According to the plan Hockery as trustee would negotiate the royalty licensing agreement with Rival. Mr. Hockery was on February 1, 1946, and continued to be until his retirement in 1961, Secretary-Treasurer and Comptroller of Rival. He was employed by the predecessor partnership.

*Third*, after the execution of the Hockery trust, the plaintiff would execute three Declarations of Trust conveying to the First National Bank of Kansas City, in three stated percentages (totaling 100%) all of plaintiff's equitable

2. Rival's sales in prior years on these items were: 1936, $108,004; 1937, $196,350; 1938, $259,756; 1939, $363,-938; 1940, $539,528; 1941, $709,647; 1942, $854,131. 1943 and 1944 were war work years.

beneficial right, title and interest in the Hockery trust properties. Each of three trusts would be for the benefit of one of the children of the plaintiff. These conveyances in trust would be complete, irrevocable and not subject to amendment or modification by the plaintiff as settlor. These three trusts are referred to hereinafter as the "Bank Trusts." The trust for the child Jacquelynne would terminate on her death or within 20 years thereafter, depending on contingencies. The trust for the child Henry Stephen would terminate on his 35th birthday. The trust for the child Foster, Jr., would terminate on his 35th birthday. In event of death of each beneficiary provision would be made for disposition of any undistributed trust property. No reversionary or other interest would be retained by the plaintiff.

The plan was approved by all parties to the four trust agreements and executed in three stages.

### Execution of the Plan for the Gifts

On February 1, 1946, plaintiff, his father, Henry J. Talge, and John C. Hockery executed the proposed Hockery Trust agreement. The assignment of the patents and patent applications to the trustee was prepared by the patent attorney Mr. Scofield, executed by the settlors and then properly recorded in the United States Patent Office. As a result of the Hockery Trust agreement and the assignment of the patents and patent applications, the trustee Hockery became the legal owner of the patents and the patent applications formerly owned by plaintiff and his father. Plaintiff and his father then owned an equitable assignable beneficial interest in the trust properties.

3. In his opening statement counsel for the defendant argued that the evidence would show that "there was no adequate past experience of the revenue to be derived from these particular patents so as to project them into the future." Tr. 21. From this it was contended that no gift could be made of the patents. Tr. 23, 24.

The evidence provided an adequate basis of experience for evaluating the patents

On February 2, 1946, plaintiff and the First National Bank executed the three proposed declarations of trust creating the Bank Trusts.

Thereafter the Hockery Trust and the Bank Trusts were administered according to the trust agreements at all times in question, up to and including the time of trial.

On February 3, 1946, the trustee Hockery and Rival executed a license agreement under which Rival was granted the exclusive right to the manufacture, use and sale of the items covered by the patents and patent applications. On the same day the trustee Hockery by writing instructed Rival to pay the royalties under the license agreement directly to the Bank as trustee. These instructions were followed from 1946 until the time of trial.

In February, 1946, plaintiff was the President of Rival and owner of 46½% of its stock.

### Payment of the Gift Tax by the Plaintiff for 1946

On or before March 15, 1947, the plaintiff made a timely gift tax return for the calendar year 1946. Using Hoskold's formula applied to past experience to calculate the value of the gifts, plaintiff placed a value of $31,160.13 on the gifts represented by the three Bank Trusts. This evaluation was accomplished in a recognized and customary manner. It included the entire value of plaintiff's interests in the property transferred. It is conceded by the defendant that the statute of limitation forecloses reexamination of the propriety of this evaluation. Independently the Court concludes that any reexamination of the evaluation is barred by the statute of limitations.[3]

and patent applications. Therefore only the amount of the evaluation, and the methods employed could be questioned before the statute of limitations ran. The value of the gift was fixed in 1946 on the basis of past experience, under Hoskold's formula, using a discount factor of 4% and a return on the investment of 10%. This was not an unreasonable method. The evaluation was made in good faith under accepted methods in the

*Payment of the Gift Tax
in Issue for 1947*

As a result of a claim by the defendant that there was a gift in each year of the sums paid to the Bank as trustee under the three trusts, the plaintiff on March 30, 1961, filed a gift tax return for the calendar year on Treasury Department Form 709, and paid the tax of $6,399.59 shown to be due thereon with interest. On June 9, 1961, after receiving notice from the defendant that a penalty of 25% was due under Section 291, I.R.C.1939, for failure to file a timely gift tax return for 1947, plaintiff paid a penalty of $1,599.90.

*Defendant's Contentions*

In defense of this suit the defendant made the following primary contention (Brief for Defendant, pp. 4–5):

"The Government asserts that the facts established on the trial of this case show clearly that, under the judicial doctrine established in Helvering v. Clifford, 309 U.S. 331 [60 S.Ct. 554, 84 L.Ed. 788], and the cases following that decision, the taxpayer remained in a position of substantial control over the Hockery Trust and, therefore is deemed the owner of the corpus of that trust for tax purposes; and, as such owner of the corpus, i. e., certain patents, is deemed to be the donor of a taxable gift each time a royalty from the patent license is paid, at his direction, to the First National Trust."

In detail the defendant's theory of the case is further defined by its requested conclusions of law 1–10 inclusive.[4] These requested conclusions of law follow:

"1. As a 46½ percent stockholder and president of Rival Manufacturing Company, plaintiff was the controlling stockholder-officer of that company at the time of the establishment of the so-called trusts and at the execution of the licensing agreement.

"2. As such controlling stockholder-officer, plaintiff remained in such a position of control and retained such control over the trustee and licensee and, therefore, over the corpus after the declaration of the Hockery trust that he is the owner of the corpus for tax purposes.

"3. As such controlling stockholder-officer plaintiff remained in such a position of control and retained such control over the trustee and licensee and, therefore, over the corpus after the declaration of the Hockery trust that the transfer in trust was incomplete for gift tax purposes.

"4. Since the plaintiff remained the owner of the corpus of the Hockery trust, and since the transfer was incomplete for gift tax purposes,

---

light of known facts. No discount in the value of the patents and patent applications was claimed although the complete transfer was of the beneficial interest of plaintiff in the Hockery Trust rather than of the patents and patent applications themselves. The return to the Bank Trusts from the royalties has proven to be greater than was, or could have been anticipated in February, 1946. In fact the return paid to the Bank in 1946 was $33,948.98. This however is relevant only to the amount of the valuation of the gift, now a closed matter. It appears that the greatly increased earnings from the patent and patent applications was unforeseen by anyone.

The patents and patent applications were capable of evaluation in February, 1946, on the information then available even though elements of prophecy and speculation were involved, as in the case in the evaluation of many species of property. Ithaca Trust Co. v. United States, 279 U.S. 151, 49 S.Ct. 291, 73 L.Ed. 647. Since a basis for evaluation existed in 1946 it is unnecessary to decide whether the absence of experience or difficulty in finding a basis for evaluation would have rendered the attempted gift void. Cf. Galt v. Commissioner (C.A.7) 216 F.2d 41, cert. denied, 348 U.S. 951, 75 S.Ct. 438, 99 L.Ed. 743; Smith v. Shaughnessy, 318 U.S. 176, 63 S.Ct. 545, 87 L.Ed. 690.

4. All findings of fact requested by the defendant after the trial have been made herein. After the trial the parties stipulated the uncontroverted facts in a stipulation appended to this memorandum.

plaintiff's subsequent attempt to transfer his right to receive the patent royalties from the Hockery trust did not constitute a transfer of a unitary gift of his conglomerate [sic] rights in the Hockery trust.

"5. As the constructive owner of the trust corpus and, therefore, the constructive recipient of the royalty payments, each royalty payment is in legal effect deemed to be received by him from Rival and given by him to the First National Bank each time Rival makes a royalty payment to the First National Bank.

"6. Each payment of patent royalties by Rival to the First National trust, pursuant to the standing directions of plaintiff, constitutes taxable gifts by plaintiff insofar as said amounts are accumulated by the First National for the benefit of plaintiff's children.

"7. When the plaintiff prepared and filed his gift tax return on or about March 15, 1947, for the year 1946, he knew, or should have known, that the receipts for 1946 from the licensee of the patents equalled or slightly exceeded the entire value which he had placed on the trust res.

"8. Since the second trust, or First National trust, continued to receive payments during 1947 and subsequent years from royalties paid by the Rival Manufacturing Company, these would likewise constitute completed gifts in the year of receipt and would be subject to the payment of gift tax for the year or years of receipt by the trust.

"9. Since the receipts by the First National trust in 1947 were completed gifts in that year, the plaintiff is not entitled to recover in this action.

"10. Plaintiff's, complaint herein will be dismissed with prejudice with costs taxed against plaintiff."

None of these conclusions of law [5] can be adopted because they are based on the unsound contention that invalidity of the gifts in question is established under the doctrine of the Clifford case.[6]

*Clifford Doctrine Not Controlling*

■ The doctrine of the Clifford case is not controlling upon the question whether a transfer is complete or incomplete for gift tax purposes. A transfer may be complete for gift tax purposes, while at the same time the income from the transferred property may be taxable to the donor. Galt v. Commissioner (C.A.7) 216 F.2d 41, cert. denied, 348 U.S. 951, 75 S.Ct. 438, 99 L.Ed. 743; Lowndes & Kramer, Federal Estate and Gift Taxes (2d ed., 1962) Sections 28.14 and 31.10, pp. 639–41, 679–81 and cases therein cited particularly in note 35 at page 640.

In Galt v. Commissioner (C.A.7) 216 F.2d 41, cert. denied, 348 U.S. 951, 75 S.Ct. 438, 99 L.Ed. 743, a question similar to that in the case at bar was decided. In the Galt case, the taxpayer made a lease of real estate in February, 1946. By the terms of the lease and by a separate writing, the taxpayer made an irrevocable gift of fractions of the reserved rentals to his three sons. Under the lease, rentals were to accrue annually and were actually paid over to the three sons of the taxpayer during the term of the lease. The taxpayer retained ownership of the leased real estate and retained the right to the portion of the annual rentals which had not been given to his sons.

The Commissioner asserted a tax liability for *income* taxes in respect of the rentals paid to the sons of the taxpayer in the year 1946. The Commissioner also asserted a *gift* tax liability against the taxpayer for the year 1946 claiming that

5. Except No. 1 in a modified form to the effect that plaintiff was one of the dominant controlling stockholders and officers of Rival at the time of the establishment of the trusts and execution of the licensing agreement.

6. Helvering v. Clifford, 309 U.S. 331, 60 S.Ct. 554, 84 L.Ed. 788.

a gift was made of the 1946 rental when paid to the sons in October of 1946.

The Tax Court upheld the Commissioner in each instance holding that the taxpayer was liable for both income taxes and gift taxes in respect of the rentals paid to the sons of the taxpayer in October, 1946.

The Seventh Circuit Court of Appeals reversed the Tax Court on the gift tax issue, holding that the transfer to the sons of rights to the rentals occurred in February, 1946, and were taxable as gifts as of the value of the rights transferred in February, 1946. The Court further expressly held that the taxpayer was not liable in the years succeeding 1946 for a gift tax on the annual rentals paid to the sons of the taxpayer in the years after 1946.

At the same time, the Court of Appeals upheld the ruling of the Tax Court on the income tax issue that the taxpayer was subject to income tax in 1946 and each succeeding year for the rents paid annually to his sons because " * * * one who retains property from which income is produced is obligated to account therefor even though he has assigned it, thereby divesting himself of all control, and even though it is actually received by the assignee and not by him." 216 F.2d at page 46.

But the Court of Appeals was careful to point out that it did not follow that the income tax ruling should govern the gift tax issue and result in an annual gift tax on the rentals when paid to the sons in 1946 and the succeeding years. On this subject the Court of Appeals carefully pointed out that the notion that the income tax issue ruled the gift tax issue, or *vice versa*, was unfounded, saying:

"In our view, this notion apparently indulged in by both parties has no basis in law or in fact. True, it has been held that the gift tax is supplementary to the estate tax, the two are in pari materia and must be construed together. Estate of Sanford v. Commissioner, 308 U.S. 39, 60 S.Ct. 51. 84 L.Ed. 20. See also

Smith v. Shaughnessy, 318 U.S. 176, 63 S.Ct. 545, 87 L.Ed. 690. There is no such relation, however, between a gift and an income tax. They are separate and distinct proceedings and neither is dependent on the other as the basis for the imposition of a tax." 216 F.2d at page 45.

This quoted ruling is in accord with the prevailing authority. Lowndes & Kramer, Federal Estate and Gift Taxes, 2d ed., 1962, Sections 28.14 and 31.10, pages 639 to 641 and 679 to 681, and cases therein cited, particularly in note 35 at page 640.

After announcing this principle, the Court of Appeals reversed the holding of the Tax Court that for 1946 a gift tax was owing on the annual rent paid the sons in October, 1946, saying:

"While the court did not so expressly state, it is implicit in its holding that petitioner would be liable each succeeding year for a gift tax upon amounts paid to his sons under the terms of the lease. In fact, that was respondent's contention before the Tax Court, as shown in the quotation first above made from the opinion of the Tax Court, wherein it is stated that respondent 'assumed the basic position that petitioner made gifts to his sons each year as, and in the amounts that, the rentals were paid to them year by year.' This incongruous result would be in prospect notwithstanding the fact that petitioner committed no affirmative act with reference to payments to his sons other than that performed on February 26, 1946, when the assignments were made.

\* \* \* \* \* \*

"It is our view that the gift, conceded by all parties to have been made in 1946, was made on February 26, as urged by the petitioner. To think otherwise is to ignore the plain, unambiguous terms of the statute, as well as the regulations promulgated in connection therewith." 216 F.2d at pages 49 and 50.

In undertaking to distinguish the Galt case from the case at bar, the Government asserts that "in the instant case taxpayer has retained the essential control over the subject matter of the trust and the power to manipulate and direct future royalties which was lacking in Galt." The evidence in this case does not sustain this claim of the Government. On the contrary, the taxpayer has proved by a preponderance of the evidence that the taxpayer in the case at bar in making the bank trust intended to and did divest himself of title, dominion and control over the subject matter of the gift. The evidence further shows by a substantial preponderance that the administration of the trusts was intended to be and was in keeping with this intention of the taxpayer when viewed prospectively and retrospectively.

*Additional Authorities Distinguished*

In support of its contentions the defendant relies on the following additional authorities: Estate of Sanford v. Commissioner, 308 U.S. 39, 60 S.Ct. 51, 84 L.Ed. 20; Rasquin v. Humphreys, 308 U.S. 54, 60 S.Ct. 60, 84 L.Ed. 77; Byerly v. Commissioner (C.A.6) 154 F.2d 879; Williamson v. Commissioner (C.A.7) 132 F.2d 489; Funsten v. Commissioner (C.A.8) 148 F.2d 805; Goemans v. Commissioner (C.A.7) 279 F.2d 12; McKnight v. Commissioner (C.A.8) 123 F. 2d 240; Richardson v. Commissioner (C.A.2) 151 F.2d 102.

Neither Estate of Sanford v. Commissioner, 308 U.S. 39, 60 S.Ct. 51, 84 L.Ed. 20, nor Rasquin v. Humphreys, 308 U.S. 54, 60 S.Ct. 60, 84 L.Ed. 77, is in point in respect to the question in the case at bar. While both the Sanford case and the Rasquin case involve gift tax liability, the factual situation in each case was decidedly and significantly different from that in this case.

In the Sanford case the taxpayer was the settlor of an *inter vivos* trust created in 1913 for the benefit of others. In creating the trust in 1913 the settlor reserved the power to revoke in whole or in part or to modify it. In 1919 the taxpayer surrendered the power to revoke the trust reserving the right to modify the trust provided that this right should in no way be deemed to include any right or privilege of the taxpayer to withdraw principal or income from the trust. In August, 1924, after the effective date of the gift tax statute, the taxpayer renounced his remaining power to modify the trust. The power to modify the trust renounced in 1924 included the right to change the beneficiaries of the trust.

The Supreme Court held in the Sanford case that the 1919 renunciation of the power to revoke the trust reserving a restricted power to modify the trust, including the power to change the beneficiaries, was an incomplete transfer for gift tax purposes. The Supreme Court further held that the 1924 renunciation of the reserved power to modify the trust was taxable as a gift. In so holding the Supreme Court carefully explained the relation between the gift tax and the estate tax and the precise basis of its ruling that no taxable gift occurred in 1919, saying:

"The gift tax was supplementary to the estate tax. The two are in pari materia and must be construed together. Burnet v. Guggenheim, supra, 288 U.S. [280] page 286, 53 S.Ct. [369] page 371, 77 L.Ed. 748 [751]. An important if not the main purpose of the gift tax was to prevent or compensate for avoidance of death taxes by taxing the gifts of property inter vivos which, but for the gifts, would be subject to its original or converted form to the tax laid upon transfers at death.

"Section 322 of the 1924 Act, * * * provides that when a tax has been imposed by § 319 upon a gift, the value of which is required by any provision of the statute taxing the estate to be included in the gross estate, the gift tax is to be credited on the estate tax. The two taxes are thus not always mutually exclusive as in the case of gifts made in contemplation of death which are complete and tax-

able when made, and are also required to be included in the gross estate for purposes of the death tax. But § 322 is without application unless there is a gift inter vivos which is taxable independently of any requirement that it shall be included in the gross estate. Property transferred in trust subject to a power of control over its disposition reserved to the donor is likewise required by § 302(d) to be included in the gross estate. But it does not follow that the transfer in trust is also taxable as a gift. The point was decided in the Guggenheim case where it was held that a gift upon trust, with power in the donor to revoke it is not taxable as a gift because the transfer is incomplete, and that the transfer whether inter vivos or at death *becomes complete and taxable only when the power of control is relinquished.* We think, as was pointed out in the Guggenheim case, supra, 288 U.S. page 285, 53 S.Ct. page [369] 370, 77 L.Ed. 748 [751], that *the gift tax statute does not contemplate two taxes upon gifts not made in contemplation of death,* one upon the gift when a trust is created or when the power of revocation, if any, is relinquished, and another on the transfer of the same property at death because the gift previously made was incomplete." (Emphasis added.) 308 U.S. 39, 60 S.Ct. 51, 84 L.Ed. 23–24.

In holding that the retention of the power to modify by changing the beneficiaries rendered the transfer in trust incomplete for gift tax purposes, the Supreme Court said:

"It is plain that the contention of the taxpayer in this case that the gift becomes complete and taxable upon the relinquishment of the donor's power to revoke the trust cannot be sustained unless we are to hold, contrary to the policy of the statute and the reasoning in the Guggenheim case, that a second tax will be incurred upon the donor's relinquishment at death of his power to select new beneficiaries, or unless as an alternative we are to abandon our ruling in the Porter case.

\* \* \* \* \* \*

"There are other persuasive reasons why the taxpayer's contention cannot be sustained. By §§ 315(b), 324 [43 Stat. 312, 316, 26 U.S.C.A. Int.Rev.Acts, pages 77, 83] and more specifically by § 510 of the 1932 Act, 26 U.S.C.A. [559] 1009, the donee of any gift is made personally liable for the tax to the extent of the value of the gift if the tax is not paid by the donor. *It can hardly be supposed that Congress intended to impose personal liability upon the donee of a gift of property, so incomplete that he might be deprived of it by the donor the day after he had paid the tax.* Further, § 321(b) (1), 43 Stat. 315, 26 U.S.C.A. Int.Rev. Acts, page 82, exempts from the tax, gifts to religious, charitable, and educational corporations and the like. A gift would seem not to be complete, for purposes of the tax, where the donor has reserved the power to determine whether the donees ultimately entitled to receive and enjoy the property are of such a class as to exempt the gift from taxation. *Apart from other considerations we should hesitate to accept as correct a construction under which it could plausibly be maintained that a gift in trust for the benefit of charitable corporations is then complete so that the taxing statute becomes operative and the gift escapes the tax even though the donor should later change the beneficiaries to the non-exempt class* through exercise of a power to modify the trust in any way not beneficial to himself." (Emphasis added.) 308 U.S. 39, 60 S.Ct. 51, 84 L.Ed. at page 24.

So it is clear that the determinative factor rendering the transfer incomplete in the Sanford case was the retention of the power to change the beneficiaries.

846

There was no such power retained by the plaintiff in this case after the establishment of the bank trusts.

■ To the extent that the Sanford case holds that a taxpayer who transfers (or relinquishes) all interest in an incomplete *inter vivos* transfer in trust makes a taxable gift, the case supports the plaintiff's contentions. The Hockery Trust was an incomplete transfer. The Bank Trusts made the incomplete transfer to Hockery as trustee a complete transfer provided that the corpus or income of the incomplete Hockery Trust did not remain subject to the control of the plaintiff. The principle is stated and the authorities collected in Lowndes & Kramer, op. cit., Section 28.14, pp. 639–40. The text reads in part:

" § 28.14 Gifts of Income from Incomplete Trusts

"When the income from a trust which is incomplete because the settlor retains power to alter or revoke the trust without the concurrence of anyone possessing a substantial adverse interest in the trust is paid over to a beneficiary, there will be a taxable gift of the income to the beneficiary. The reason is that at that moment the income paid to the beneficiary passes beyond the control of the settlor of the trust. *The critical consideration which determines whether the payment of the income from a trust to a beneficiary of the trust constitutes a gift of the income is whether the income remains subject to the dominion of the settlor of the trust until it is paid over to the beneficiary.* If the settlor of the trust parted with power to control the trust property at the time he created the trust so that he had no control over the income from the property there will be no gift at the time the income is paid over to the beneficiary. In this connection the test of whether a transfer in trust was complete so that there will be no further gift of income when income is distributed to a beneficiary is whether the transfer was complete under the gift tax, rather than the income tax. If the transfer was complete under the gift tax when the trust was created there will be no further gift of the income from the trust when it is paid over to a beneficiary, even though the transfer in trust is treated as incomplete under the income tax and the income is taxable to the settlor of the trust. For example, if A creates an irrevocable trust to pay premiums on life insurance policies on his life which are irrevocably assigned to the trustee in trust for C, the income from the trust which is used to pay these premiums will be taxed to A. However, since when A created the trust he parted with all control over the trust property and the income from the trust there will be no gift of the income which is devoted to paying premiums on life insurance policies belonging to one other than the settlor of the trust, even though this income is treated as A's income under the income tax. In the same way if A creates a short term trust whose income is taxed to him under Helvering v. Clifford the creation of the trust will be treated as a gift of the equitable term for years in the trust, and there will be no further gifts when the income from the trust is paid over to the beneficiary of the trust. Even though A is treated as the substantial owner of the trust property and the income from the trust is regarded as his income under the income tax, since he parted with control over the income from the trust when he created the trust, there will be no gift of the income when it is paid to the beneficiary of the trust." (Footnotes in original omitted. Emphasis added.)

In the Rasquin case a factual situation substantially the same as that in the Sanford case was involved. There the Supreme Court held, upon the basis of the ruling in the Sanford case, that an *inter vivos* trust by the taxpayer for his

own benefit for life, with remainder to specified classes of beneficiaries, with the reserved power in the taxpayer to change beneficiaries and to prescribe conditions under which new beneficiaries should take an interest in the trust, but without power to increase his own beneficial interest in the trust power, was not taxable as a gift. The transfer was held not taxable as a gift "for the reasons stated in our opinion in the Sanford Case we conclude that the reserved power in the donor at the time of the creation of the trust rendered the gift incomplete and not subject to the gift tax." 85 L.Ed. at page 78. Not one of the powers reserved by the taxpayer in the Rasquin case was reserved by plaintiff in this case. So the Rasquin case is not in point.

Because each involves income tax liability under the inapplicable Clifford doctrine, and because each is distinguishable from the facts in the case at bar, none of the following additional cases relied upon by the defendant are in point: Byerly v. Commissioner (C.A.6) 154 F.2d 879; Funsten v. Commissioner (C.A.8) 146 F. 2d 805; Williamson v. Commissioner (C.A.7) 132 F.2d 489; Goemans v. Commissioner (C.A.7) 279 F.2d 12; McKnight v. Commissioner (C.A.8) 123 F. 2d 240.

Of the cases relied upon by defendant this leaves the case of Richardson v. Commissioner (C.A.2) 151 F.2d 102, to be considered on this issue. In the Richardson case the tax liability in question was gift tax liability but the factual situation was significantly different. In the Richardson case the taxpayer trustee had the power to revoke trusts, the income from which was accumulated for third parties unless the trusts were revoked. The transfers considered taxable annually were the failures in 1933, 1934 and 1935 to revoke the trusts and to recapture the income. As a result of these failures to revoke, the income was accumulated in

each of the three years. It was held that these were therefore gifts of the annual income in each of the three years, although upon revocation of the trusts in 1941, the income was recaptured by the trustee. A subordinate holding was that a failure to revoke was not a tax exempt release of a power of appointment. The statement of the facts of this case so obviously shows that it is not in point that further analysis of the case is not warranted.[7]

Since it has been determined that the Clifford doctrine and the cases relied upon by the defendant are not applicable, there remains the task of determining whether under the statutes, regulations, and decisions governing the gift tax liability in question, the plaintiff made a completed transfer in February, 1946, of all his right, title and interest in the subject of the gift.

### Applicable Statutes

The controlling statutes involved are Sections 1000(a, b) and 1005, IRC 1939.

Section 1000(a) provided in the pertinent part that "[f]or the calendar year 1940 and each calendar year thereafter a tax, computed as provided in section 1001, shall be imposed upon the transfer during such calendar year by any individual, resident or nonresident, of property by gift."

Section 1000(b) provided in the pertinent part that "The tax shall apply whether the transfer is in trust or otherwise, whether the gift is direct or indirect, and whether the property is real or personal, tangible or intangible; * * *."

Section 1005 in the pertinent part provided "If the gift is made in property, the value thereof at the date of the gift shall be considered the amount of the gift."

No significant regulations, except the Clifford regulations, have been cited by either party. Since the Clifford doctrine

7. It may be of interest to note that in a companion case, Richardson v. Commissioner (C.A.2) 121 F.2d 1, it was held that the same income was taxable income to the taxpayer because of his power to cancel and terminate the trusts.

This is consistent with the Galt case, supra, holding that income tax principles and gift tax principles are considered separately and are not by law necessarily consistent.

is inapplicable, these regulations are inapplicable.

### Application of Gift Tax Principles

The question remaining to be answered is this:

In view of the entire series of transactions of December, 1945, to February 3, 1946, including the relation of the parties, the nature of the property and interests involved, the license agreement, the capacity, independence and integrity of the trustees (or lack thereof), the good faith, intent, and business purposes of the plaintiff (or lack thereof), the good faith (or lack thereof) and performance of the parties and the surrounding circumstances, was there in reality a complete transfer in February, 1946, of all plaintiff's legal and equitable interests in the property?

### Definition of Taxable Transfer

■ For purposes of federal taxation a gift is an irrevocable complete transfer, without adequate or full consideration, by a donor, competent to make a gift, and clearly and unmistakably intended to divest the donor of title, dominion and control over property subject to being transferred, to a donee capable of accepting a gift or to someone acting as a trustee or agent for the donee capable of accepting it. 4 Rabkin & Johnson, Federal Income Gift and Estate Taxation, Sec. 51.04, page 5117; Chapter 24, Lowndes & Kramer, Federal Estate and Gift Taxes (2d ed.) pp. 574–78.

■ Where a prior transfer has not relinquished the donor's control over the property and the transfer is incomplete, a subsequent transfer or relinquishment thereof constitutes a gift. Rabkin & Johnson, supra, p. 5117; Lowndes & Kramer, supra, Section 28.14, pp. 439–40.

### Competency of Parties to Make and Receive Gift

There is no question of the competency of all parties concerned to make and receive the gift in question. Plaintiff, his father, and Hockery were adult and competent. The First National Bank was un-

questionably competent to receive the gift as trustee for the beneficiary donees.

### The Patents and Patent Applications as a Subject of Gift

■ The patents and patent applications were intangible property subject to being donated under Section 1000(b). The transfer might be of either a legal or equitable interest therein. Commissioner v. Reece (C.A. 1) 233 F.2d 30; Nelson v. Ferguson (C.A. 3) 56 F.2d 121, cert. denied, 286 U.S. 565, 52 S.Ct. 646, 76 L.Ed. 1297; Heim v. Fitzpatrick (C.A. 2) 262 F.2d 887; Cohen v. Commissioner, 15 T.C. 261; Potter v. Commissioner, 27 T.C. 200; Rev.Rul. 54–599, C.B. 1954–2, pp. 52 and 89.

### The Intention of the Plaintiff

The plaintiff clearly and unmistakably intended by the series of transactions to make a complete divestment of title and control over all his interests in the patent and patent applications. There remains the question whether by the dual trust arrangement, and license agreement, the plaintiff retained dominion and control over the transferred property. In other words, was there an incomplete transfer? This is the crux of this case.

### Was the Transfer Complete?

■ At the outset it should be noted that no one claims that the Hockery Trust was a complete transfer or gift. This trust was a preliminary step to advance the consummation of the plan for a gift. However the defendant claims that the existence of the Hockery Trust and the license agreement constituted such a retention of dominion and control that the attempted gift was an incomplete transfer. If this is correct the plaintiff's suit must fail. But in determining the correctness of the defendant's claim the entire transaction must be examined, not just the Hockery Trust.

When the transfers were made, Hockery was an employee and officers of the corporation controlled by plaintiff and his associates. But the evidence shows that he was an independent man, faithful to his obligations with considerable ex-

perience in negotiating royalty agreements. For a period of about fifteen years after February, 1946, he faithfully reported the sales on which the Bank received the royalties. Under his trusteeship Rival was required to perform all obligations of the licensing agreement, including full payment of royalties, and expenditures for the development and improvement obligations of the license agreement. The plaintiff never attempted to use his influence to direct or control Hockery in his actions as trustee. Hockery regularly consulted with and assisted Ford Nelson, Esquire, Vice President and Trust Officer of the First National Bank Trust Department in performance of the obligations of the Bank as trustee. Indeed the combined activities of Hockery as trustee, and of the Bank as trustee, were so effective that royalty collections from Rival were so great that the defendant suggests that the gift was improperly valued, a matter closed by limitations. Inconsistently, at the commencement of the trial the defendant's counsel in opening statement took the position that "The licensing agreement between the trustee and the corporation [was] at a grossly inadequate figure, and thus leaving actual practical control over the trust res in the settlor through his ownership and control of the corporation licensee." This contention has been abandoned, and disproved. The demonstrated character of Hockery and the record of administration of the two trusts disproves any contention that Hockery was dominated and controlled by the plaintiff.

But there remains to be considered the claim that the license agreement itself was an instrument through which the plaintiff retained dominion and control. It is argued that the making of this agreement was "according to a prearranged plan devised by plaintiff." It is true that the plaintiff and his father advised Hockery, when he was asked to act as trustee that Rival was to be the licensee of the patents and patent applications. But this fact alone does not render the later transfer to the Bank an in-complete transfer. All parties knew that the license agreement would have to be fair and reasonable to the trustee.

This agreement was one which might have been reached by parties dealing at arm's length. Mr. Hillix, Counsel for the plaintiff, made a study of the going royalty rates, consulted a patent attorney and advised the parties to agree on a royalty of 2% plus a reasonable amount of expenditure by Rival for experimental and development purposes. A provision for cancellation at the end of five years was incorporated. The reasonableness of the agreement was investigated by the Bank as trustee and found to be fair. It has been so satisfactory that the Bank decided not to exercise the cancellation provision. It has been so productive for the beneficiaries of the two trusts that the defendant now contends that the gift was undervalued.

Moreover Rival was the most suitable licensee because of its large and growing sales, its attractive brand names, and its facilities for uninterrupted production. The defendant has not shown or attempted to show that anyone would have made a more favorable agreement than Rival and Hockery made. Any presumption of control of Hockery by plaintiff is rebutted by the evidence, including the evidence of the supervision over the Hockery Trust by the First National Bank.

In fact, it was the execution of the Bank Trusts which constituted the complete transfer taxable as a gift. When those trusts were executed the plaintiff transferred all control over the patents and patent applications irrevocably and completely. Any opportunity to attempt to control the patents and patent applications through Hockery was surrendered. The Bank as trustee became beneficiary of the Hockery Trust. Thereafter it had the ultimate power of control of the property held in trust by Hockery, and it exercised this control. In addition to its investment, auditing and consultative service as trustee, the Bank actively asserted its right to a voice in the management of the Hockery Trust and to determine whether any proposal

to buy the patents and patent applications should be accepted or rejected. In substance, the Bank has acted as a co-trustee of the patents and patent applications to the extent of is expertise. There was valid business purpose, in creating the Hockery Trust, to secure Hockery's expert management of the patents and patent applications. Hockery's faithful performance was guaranteed by the Bank Trust.

Since (1) the taxpayer did not control Hockery as trustee, and since (2) the power to control Hockery was surrendered in the transfers to the Bank as trustee, the transfers to the Bank as trustee were complete transfers for gift tax purposes.

All the agreements, transfers and assignments in question are valid under Missouri and Federal law.[8]

### Conclusion

Therefore, viewed as a whole, considering all the circumstances, it is concluded that the transactions of February 1 to February 3, 1946, resulted in irrevocable, complete transfers and taxable gifts of all right, title and interest of plaintiff in the patents and patent applications, assigned to Hockery as trustee and thereafter transferred to the First National Bank as trustee; that plaintiff owed no gift tax penalties, or interest thereon for the year 1947; that plaintiff is entitled to recover the tax, interest and penalties sued for.

The plaintiff shall present a form of judgment on notice under Rule 6(c) of this Court.

### APPENDIX
### STIPULATION

Pursuant to the order of this Court entered June 27, 1963, counsel for plaintiff and defendant have conferred and have agreed to the following:

### STIPULATED FINDINGS OF FACT

1. This action is brought under Title 28, United States Code, Section 1346(a)

(1), and arises under the internal revenue laws of the United States. Plaintiff seeks recovery of gift taxes paid with respect to the year 1947 in the amount of $6,399.59, plus interest paid thereon in the amount of $5,007.68, plus penalty paid thereon in the amount of $1,599.90, a total of $13,-007.17.

2. On March 30, 1961, plaintiff filed a gift tax return for the calendar year 1947, on Treasury Department Form 709 and paid the tax shown to be due thereon in the amount of $6,399.59, plus interest at 6% per annum from March 15, 1948, the alleged due date of said return, to March 30, 1961, the date of payment, in the amount of $5,007.68, or a total of $11,407.27.

3. On April 11, 1961, plaintiff filed a claim for refund, on Treasury Department Form 843, demanding the refund of the aforesaid tax and interest paid thereon, and any other payments made in connection therewith.

4. Under date of May 23, 1961, defendant issued to plaintiff a statement or notice of a 25% penalty, amounting to $1,599.90, which defendant asserted was due under Section 291 of the Internal Revenue Code of 1939, with respect to the year 1947, for plaintiff's failure to file a gift tax return for said year on the date prescribed therefor, and on or about June 9, 1961, plaintiff paid the full amount of such penalty.

5. More than six months elapsed between the date of the filing of said claim for refund and the date of the filing of plaintiff's complaint herein.

6. Plaintiff is an individual residing at 413 West 62nd Street, Kansas City, Missouri. Plaintiff is the son of Henry J. Talge. Foster L. Talge, Jr., Henry Stephen Talge, and Jacquelynne K. Talge Meininger are plaintiff's children.

7. On February 1, 1946 plaintiff and his father each owned an undivided one-

---

8. For the purposes of this decision it is assumed without so deciding that the defendant is correct in its contention that no weight should be given the declaratory judgments of the Circuit Court of Jackson County in First National Bank v. Jacquelynne Talge Meininger, et al., No. 593,104, approving the Bank's administration and accounts of the trust for the Jacquelynne Talge trust. This is not to be construed as a precedent on the legal question involved.

half interest in the patents and patent applications listed and described in Schedule "A" forming a part of three instruments each styled "Declaration of Trust" (plaintiff's Exhibits A, B and C), dated February 2, 1946 in which plaintiff is named as Settlor and The First National Bank of Kansas City is named as Trustee.

8. The First National Bank of Kansas City is a corporation organized under the banking laws of the United States of America, having its principal place of business in Kansas City, Jackson County, Missouri, and having general trust powers.

9. During 1946 plaintiff and The First National Bank of Kansas City, Kansas City, Missouri, as trustee, executed the aforesaid three declarations of trust, dated February 2, 1946 (hereinafter referred to as the "Bank Trusts"); one of said trusts (Trust # 4210) was for the primary benefit of Foster L. Talge, Jr.; one of said trusts (Trust # 4211) was for the primary benefit of Henry Stephen Talge; and the third of said trusts (Trust # 4212) was for the primary benefit of Jacquelynne K. Talge, now Jacquelynne K. Talge Meininger. Said Bank signified acceptance as trustee of each of said trusts. Foster L. Talge, Jr., was born on July 22, 1938; the trust for his benefit will terminate on July 22, 1973, his 35th birthday. Henry Stephen Talge was born on July 2, 1937; the trust for his benefit will terminate on July 2, 1972, his 35th birthday. Jacquelynne K. Talge Meininger was born on July 13, 1935; the trust for her benefit will terminate on her death or within 20 years thereafter.

10. During 1946 immediately prior to the execution of the Bank Trusts, and under date of February 1, 1946, plaintiff and his father as Settlors entered into an agreement styled "Declaration of Trust" with John C. Hockery as Trustee (hereinafter referred to as the "Hockery Trust"), a true copy of which was attached to and made a part of each of the Bank Trusts, being part of Schedule "A" of each Bank Trust.

11. On the effective date of the Bank Trusts and prior to the receipt of any cash royalties, the Bank listed on its records as an asset and as evidence of the trust res of these trusts, the interest which plaintiff had in the Hockery Trust under the terms thereof.

12. On or before March 15, 1947, plaintiff filed a donor's gift tax return for the calendar year 1946 with respect to the aforesaid gifts in trust, on Treasury Department Form 709, with the Collector of Internal Revenue for the Sixth District of Missouri at Kansas City, Missouri, and paid the tax shown to be due thereon. On said gift tax return, plaintiff placed a value of $31,160.13 on the aforesaid gifts in trust. Hoskold's formula was used to calculate said value.

13. On or before March 15, 1947, the First National Bank of Kansas City, as trustee, filed a "Trustee's Information Return of Gifts," on Treasury Department Form 710, for each of the Bank Trusts.

14. The stated corpus of the Hockery Trust consisted of the aforesaid patents and patent applications owned by plaintiff and his father. The assignments of the patents from plaintiff and his father to John C. Hockery, trustee, were registered in the United States Patent Office. At the date of the establishment of the Hockery Trust the patents had an average unexpired life of between nine and one-half (9–½) and ten (10) years. A patent has a maximum life of seventeen (17) years. After seventeen (17) years, a patent is in the public domain.

15. Under the terms of the Hockery Trust instruments the Settlors reserved and retained the following interests, rights and powers: (1) the right to receive " * * * share and share alike, all the receipts of whatever nature less any operating or necessary expenses derived from the Trust Estate * * *"; (2)

852

the right, upon termination of the Trust, to receive the entire Trust Estate (corpus), together with accumulated income thereon; (3) the right to designate a successor trustee, other than one of the Settlors, in the event of the death, disability or registration of the trustee originally designated; and (4) with respect to each Settlor, " * * * the power and authority to dispose of his beneficial interest herein by sale, assignment, or transfer * * * ". The Hockery Trust was stated to be " * * * irrevocable and not subject to amendment or modification by the Settlors".

16. The Hockery Trust, under its terms, was to terminate "upon the expiration of all letters patent now or hereafter assigned to the Trustee by the Settlors, or either of them * * * ".

17. To each of the Bank Trusts plaintiff assigned a percentage of his " * * * entire right, title and interest in and to the property hereinafter described in Schedule 'A' * * * ," which property was further described as being " * * * a beneficial interest in and to such property as indicated by Schedule 'A', and to all other property including Application for Letters Patent and Letters Patent, mechanical or design, which may hereafter be made and secured for and on account of the Trust Estate". Schedule "A" of the Bank Trusts consisted of the declaration of trust of the Hockery Trust and contained a list of the patents forming the corpus of the Hockery Trust. Each of the three Bank Trusts recited:

"The Trustee hereunder shall have and receive under this conveyance all of the right, title and interest which Foster L. Talge now has or except for this conveyance might hereafter acquire in and to * * * percent * * * of said property hereinafter set out in Schedule 'A', including but not limited to the right to have and to hold said property and to demand and exercise, all and singular, the rights, privileges and immunities thereunto belonging or in any wise

appertaining unto the said Trustee, its successors and assigns forever, so that the right, title and interest of the Trustee hereunder in and to said property shall be the same as the Settlor herein". (The percentages specified in the agreements were 30% and 40%).

Each of the Bank Trusts also recited that "This Declaration of Trust is irrevocable and not subject to amendment or modification by the Settlor".

18. Under date of February 3, 1946, John C. Hockery, trustee, as licensor, and Rival Manufacturing Company, as licensee, executed a license agreement under the terms of which Rival was granted the exclusive right to manufacture, use and sell the items covered by the aforesaid patents subject to cancellation by either party at the end of five years.

19. Under date of February 3, 1946, written instructions were given by Hockery to Rival, pursuant to paragraph 7 of the license agreement, to pay the royalties due from Rival under the license agreement directly to The First National Bank of Kansas City, as trustee of the Bank Trusts.

20. The Hockery Trust, Bank Trusts and license agreement were executed on the dates which they bear.

21. Rival Manufacturing Company was incorporated under the laws of Missouri on January 22, 1946.

22. Since its incorporation, Rival has manufactured and sold a line of housewares, or kitchenwares, including, among other items, can openers, juice extractors, ice crushers, grinders and salad making machines.

23. Many of the items manufactured and sold by Rival have been those covered by the aforesaid patents and by related and improvement patents covering housewares issued subsequent to Rival's incorporation.

24. Prior to the incorporation of Rival, substantially the same business

was conducted by a partnership. Many of the same items manufactured and sold by Rival had previously been manufactured and sold by the predecessor partnership.

25. Practically all of the items manufactured and sold by the predecessor partnership were covered by the aforesaid patents owned by plaintiff and his father.

26. At the time of its incorporation Rival acquired all of the assets, including trade names, of the predecessor partnership but did not acquire the aforesaid patents owned by plaintiff and his father.

27. In 1946 and 1947 plaintiff was president of Rival.

28. In February, 1946, John C. Hockery was secretary-treasurer and comptroller of Rival. At that time Hockery had been an employee of Rival and the predecessor partnership a total of seven (7) years.

29. The written terms of the Hockery Trust gave the trustee the powers generally conferred upon trustees by law and gave him authority "to cause to be executed, exclusive or non-exclusive licenses or royalty agreements, or both, granting the right to make, use, and sell the machines, designs, and other devices covered by the property constituting the Trust Estate on such terms as in the sole and absolute discretion of the Trustee are to the best interests of the Trust Estate."

30. The royalty rate specified in the license agreement was 2% of the net price received by the licensee for patented items manufactured and sold. In addition, under the terms of the agreement, the licensee agreed to expend a reasonable amount for the purpose of patent research and development on related devices and on improvements (1% of the net wholesale price of the patented devices was specified to be reasonable) ; all improvements and new developments made by the licensee under this program were to become the property of the Hockery Trust, as licensor, subject, however, to the license agreement.

31. Rival has complied with the provisions of the license agreement requiring it to expend a reasonable amount for patent research and development. The program has been continuous and over the years an average of 1% of the net wholesale price received for the patented devices has been expended for this purpose. The program has been productive and improvements have been made continuously.

32. All improvements and new developments and patents thereon made by Rival under the research and development program conducted pursuant to the license agreement have been assigned by, or at the direction of, Rival to the Hockery Trust.

33. Patents on new items developed by Rival which are completely unrelated to items covered by the original patents in the Hockery Trust and patents which are purchased by Rival are not transferred to the Hockery Trust. Rival owns a number of patents in its own right.

34. The terms of the license agreement gave each party the right to terminate the agreement, upon 90 days written notice, at any time beginning 5 years after its effective date.

35. By the terms of the Hockery Trust instrument the trustee was required to render an accounting of the trust estate not less frequently than quarter-annually.

36. The Bank, as trustee of the Bank Trusts, has asked for and received quarterly statements of sales of items covered by the patents. The Bank has also requested and received financial statements of Rival. Prior to 1954 this data was furnished by an independent outside accountant. In 1954, at the Bank's request, Rival retained a nationally known firm of certified public accountants and this firm has since that time furnished data to the Bank.

37. No income has ever been distributed from the Bank Trusts to plaintiff's children for their maintenance and support.

38. The first payment of royalties by Rival to the Bank Trusts was made on June 25, 1946.

39. During the years 1946 through 1961, royalties were received by the Bank Trusts from Rival as follows:

| YEAR | TRUST #4210 | TRUST #4211 | TRUST #4212 |
|------|-------------|-------------|-------------|
| 1946 | $10,184.69 | $10,184.69 | $13,579.60 |
| 1947 | 10,020.65 | 10,020.65 | 13,360.85 |
| 1948 | 6,813.95 | 6,813.95 | 9,085.25 |
| 1949 | 6,040.00 | 6,040.00 | 8,053.34 |
| 1950 | 7,329.19 | 7,329.19 | 9,772.26 |
| 1951 | 2,117.78 | 2,117.78 | 2,823.70 |
| 1952 | 6,654.67 | 6,654.67 | 8,872.88 |
| 1953 | 9,575.51 | 9,575.51 | 12,767.34 |
| 1954 | 24,036.98 | 24,036.98 | 32,049.31 |
| 1955 | 4,431.94 | 4,431.94 | 5,909.25 |
| 1956 | 18,774.02 | 18,774.02 | 25,032.05 |
| 1957 | 32,659.67 | 32,659.67 | 43,546.22 |
| 1958 | 19,449.31 | 19,449.31 | 25,932.39 |
| 1959 | 25,851.66 | 25,851.66 | 34,468.92 |
| 1960 | 14,373.89 | 14,373.89 | 19,165.20 |
| 1961 | 23,309.44 | 23,309.44 | 31,079.23 |

40. The Bank, as trustee, has filed federal fiduciary income tax returns for the years 1946–1961, inclusive, for each of the Bank Trusts and in each case has included the royalties as taxable income.

41. On two of the fifty-two patents originally transferred to the Hockery Trust was plaintiff named as the inventor. These patents both covered an electric broiler. Since the establishment of the Hockery Trust and the Bank Trusts, no broilers covered by these patents have been manufactured or sold and no royalties have been paid with respect to said patents. Plaintiff was not the inventor of any of the other items covered by the patents originally transferred to the Hockery Trust and has not been the inventor of any improvements developed or patented since the establishment of the several trusts.

42. The plaintiff filed a timely gift tax return for the calendar year 1946 in which the value of the gift at the date of gift was reported at $9,348.04 for Trust #4210, the same for Trust #4211, and $12,464.05 for Trust #4212, or a total of $31,160.13 for his one-half interest in the patents, the subject of plaintiff's gift. The value was determined as follows:

(1) the 2% royalty rate was applied to the historical sales of the patented items for the eight of the ten years preceding the gift in which sales were made;

(2) The result was multiplied by the average remaining legal life of the patents and the value determined under Hoskold's formula using a discount factor of 4% and a return on the investment of 10%.

43. The value on February 2, 1946, of the patents assigned is set forth in the decree of the Circuit Court of Jackson County, Missouri, in an action brought by The First National Bank of Kansas City, Trustee, Plaintiff vs. Jacquelynne K. Talge Meininger, et al., Defendants. No. 593104, which action was brought by the Trustees for approval of its accounts and for instructions concerning distribution of net income.

The Court is advised that the above stipulations of fact comprise a considerable portion of the findings of fact pre-

viously requested by both parties. There are, however, issues of fact as to which the parties are still in disagreement, and each party, therefore, reserves the right to file a further request for findings of fact in addition to those above stipulated.